# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DONALD RAY LEE,

    Petitioner,

vs.

E. K. MCDANIEL, et al.,

    Respondents.

Case No. 3:05-CV-00378-ECR-(RAM)

**ORDER**

    Before the Court are the Amended Petition for Writ of Habeas Corpus (#11), Respondents' Answer (#70), and Petitioner's Reply (#73). The Court finds that relief is not warranted and denies the Amended Petition (#11).

    This case involves five shootings in Las Vegas and North Las Vegas on the night of August 9-10, 1985. Around 11:00 p.m. on August 9, occupants of a two-tone Toyota opened fire near the intersection of D St. and Jackson Ave. Christopher Shelton, a pedestrian, was shot through the ankle. Darrell Finks, a passenger in a pickup truck, was shot in the buttocks. Around 2:10 a.m. on August 10, occupants of a two-tone Toyota opened fire near H St. and Monroe Ave. Ronnie Johnson, who was leaning against a vehicle and talking with friends, was shot through the abdomen. Around 3:00 a.m., occupants of a two-tone Toyota opened fire in the Doolittle Center public housing complex near H St. and Owens Ave. Miecha Grayson, a passenger on a moped, was shot in the neck. Some time between 3:00 a.m. and 3:38 a.m., John Brown was abducted from an apartment complex near Holly Ave. and Simmons St., where he was preparing newspapers for delivery. He was robbed, and he was beaten and shot to death between some apartments near Holly

Ave. and Allen Ln.  Around 3:30 a.m., occupants of a two-tone Toyota opened fire on a car occupied by Larry Brown and Michael Clark.  Neither Brown nor Clark were shot, but the car was hit.  At 3:38 a.m., police officers Brotherson and Montes, having heard reports of shots being fired from a two-tone Toyota, spotted the vehicle on Lake Mead Blvd. at H St.  The driver of the Toyota noticed the officers, turned right onto H St. from the middle lane of eastbound Lake Mead Blvd., and the officers followed with their lights on.  After a short chase, the Toyota crashed.  Three people fled successfully from the car, and the officers arrested Reginald Hayes at the scene.  Meanwhile, a request for homicide detectives to respond to the apartments near Holly Ave. and Allen Ln. came over the radio.  The officers asked Hayes if he knew anything about that shooting, and Hayes said that he did.  He then guided the officers to where Brown's body lay.  Hayes' information led to the arrests of Eddie Ray Hampton, Philip Minor, and Petitioner.  Police recovered a .38-caliber revolver and a sawed-off .22-caliber rifle.  The victims' wounds were consistent with these weapons.

Philip Minor agreed to plead guilty in exchange for a sentence of life imprisonment without the possibility of parole.  Petitioner went to trial with Hayes and Hampton.  Petitioner was convicted of four counts of attempted murder with the use of a deadly weapon and one count of murder with the use of a deadly weapon.  Ex. 3 (#16-2, p. 13).[1]  Petitioner appealed, and the Nevada Supreme Court remanded for consideration whether the prosecution's peremptory challenge of the sole black prospective juror violated the constitution.  Ex. 4 (#16-2, p. 16).  After an evidentiary hearing, the trial court concluded that there was no constitutional violation.  Ex. 5 (#16-3, p. 1); Ex. 6 (#16-3, p. 12).  The Nevada Supreme Court then dismissed the appeal.  Ex. 7 (#16-3, p. 16).

Petitioner then submitted in state court a petition for post-conviction relief, with a supporting brief.  Ex. 11 (#16-4, p. 9); Ex. 12 (#16-5, #16-6).  The district court dismissed the petition as untimely, but the Nevada Supreme Court concluded that the dismissal was incorrect.  Ex. 19 (#16-8, p. 12).  The district court then held an evidentiary hearing.  Ex. 21 (#16-9 through #16-15).  The district court then denied the petition.  Ex. 22 (#17-2, p. 1).  Petitioner appealed, and the Nevada Supreme Court affirmed.  Ex. 23 (#17-2, p. 10).

---

[1] Page numbers in parentheses refer to the Court's electronically filed documents.

Petitioner then filed his first federal habeas corpus petition, <u>Lee v. McDaniel</u>, Case No. 3:98-CV-00642-DWH-(VPC). The Court concluded that Petitioner had not exhausted his available state-court remedies for all his grounds. Petitioner elected to dismiss the action and return to state court.

Petitioner then filed his second state habeas corpus petition. Ex. 25 (#17-1). The district court dismissed the action because it was untimely and successive, pursuant to Nev. Rev. Stat. § 34.726 and § 34.810, respectively. Ex. 29 (#17-9, p. 1). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 30 (#17-9, p. 8).

Petitioner then filed his second federal habeas corpus petition (#4) in this action. The Court appointed counsel, who filed the Amended Petition (#11). The Court determined that Petitioner had not exhausted his available state-court remedies for Ground 10, and the Court determined that Petitioner had procedurally defaulted Ground 12. Order (#66). Petitioner elected to dismiss Ground 10. Decl. (#68).

"A federal court may grant a state habeas petitioner relief for a claim that was adjudicated on the merits in state court only if that adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" <u>Mitchell v. Esparza</u>, 540 U.S. 12, 15 (2003) (quoting 28 U.S.C. § 2254(d)(1)), or if the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

> A state court's decision is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court's decision is not "contrary to . . . clearly established Federal law" simply because the court did not cite our opinions. We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

<u>Id.</u> at 15-16. "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.

-3-

Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotations omitted).

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> When it comes to state-court factual findings, [the Antiterrorism and Effective Death Penalty Act] has two separate provisions. First, section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. Second, section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."
>
> We interpret these provisions sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy. The first provision—the "unreasonable determination" clause—applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all. What the "unreasonable determination" clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).

"Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record without holding an evidentiary hearing." Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005). The requirements of § 2254(e)(2) apply to a Rule 7 expansion of the record, even

-4-

without an evidentiary hearing. Id. "An exception to this general rule exists if a Petitioner exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings." Id.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004), cert. dismissed, 545 U.S. 1165 (2005).

Ground 1 is a claim that the prosecution improperly used a peremptory challenge to strike the only black prospective juror, Michael Stevenson. See Batson v. Kentucky, 476 U.S. 79 (1986). A trial judge must determine (1) whether a defendant has made a prima facie showing of discrimination against jurors based upon race, (2) whether the prosecution has an adequate race-neutral explanation for the peremptory challenge, and (3) whether the defendant has established purposeful discrimination. 476 U.S. at 96-98. The trial court recognized those elements and applied them. Ex. 5, p. 5 (#16-3, p. 6). Consequently, the state courts' determination was not contrary to Batson.

The trial court noted that the prosecution stated four factors for its desired jurors: (1) women,[2] (2) a nexus to Clark County, (3) mature and with children generally in the same age brackets as the victims (22, 21, 17, and 12), (4) born and raised in smaller areas that were not permeated with crime, gangs, and narcotics. Ex. 5, p. 2 (#16-3). These were not the only factors. At the Batson hearing, the attorneys testified that they also considered education, experience with the justice system, and being a victim of a crime, among other things. The prosecution had eight peremptory challenges. It used its first challenge to strike Roger Parkman. Prosecutor Michael Villani testified that Parkman had been arrested for driving under the influence and for possession of a controlled substance, and that Parkman knew one of the defense attorneys. Ex. 57, p. 52 (#60-5, p. 4) The prosecution waived its second through fifth peremptory challenges, in large part because the defendants' challenges were creating the panel that the prosecution wanted. Ex. 57, pp.

---

[2] Discrimination based upon gender is also unallowable. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994). The parties do not raise this issue, and the Court will not consider it because Petitioner's judgment of conviction became final before the J.E.B. decision.

40-41 (#60-4, pp. 17-18). The prosecution used its sixth challenge to remove Benjamin Mitchell, who had just been drawn to replace the defendants' fifth challenge. Ex. 38, pp. 130-33 (#51-13, pp. 7-10). Villani testified that Mitchell was unemployed, his wife was unemployed, and his children were very young. Ex. 57, p. 54 (#60-5, p. 6). The prosecution then used its seventh challenge to remove Michael Stevenson. Ex. 38, p. 139 (#51-13, p. 16). Amelia Martin was selected to replace Stevenson, and she was removed for an undisclosed reason. Id., p. 143 (#51-14, p. 5). Gabriel Pascarella was selected to replace Martin, and the defense used its seventh peremptory challenge to remove him. Id., p. 146 (#51-14, p. 8). Frank Eckerson was selected to replace Pascarella. Id. The prosecution waived its eighth challenge. Id., pp. 150-51 (#51-14, pp. 12-13). The defense exercised its eighth challenge upon someone else. Id., p. 151 (#15-14, p. 13).

Petitioner argues that the choice to strike Stevenson but to keep Eckerson was racial discrimination. Neither of them fully fit the prosecution's desired profile. Eckerson was a white man, had lived in Clark County for a couple of years, was mature but with no children, and was raised in Nyack, New York, a suburb of New York City. Stevenson was a black man, had lived in Clark County for one and a half years, was young with young children, and was raised in the west side of Manhattan, in New York City. One of the prosecutors testified that when he heard Stevenson say where he was raised, he thought that Stevenson might not have thought that gang-related shootings were not that much of a problem. Ex. 57, p. 12-13 (#60-3, p. 13-14).

The trial court concluded that the state had given racially-neutral explanations and had not violated Batson. The court held:

> The arguments propounded by the State for the peremptory challenge of Mr. Stevenson appear to be racially neutral, and satisfy the requirements of Slappy v. State, supra, cited with approval in Clem v. State, supra, for the following reasons:
>
> 1.   A group bias that those raised in large metropolitan areas may have been "so exposed to the crime problem in terms of the underlying social factors which cause crime so as to be jaded in their point of view towards this case." (State's brief, page 8). Mr. Stevenson was raised on the west side of Manhattan. This area would certain appear to fit into that classification. Manhattan either contains or is immediately adjacent to areas that have substantial gang problems, drug problems, and crime. The fact that Mr. Eckerson, who came from Nyack, New York, a suburb of Manhattan and Mr. Barr, who came from Houston, were not challenged does not negate the State's reasoning. The suburbs is [sic] where Manhattanites, of both races, who can afford to, live to get away from the very thing the State is concerned about. Further, to compare the west side of Manhattan to the city of Houston is

simply not appropriate. Houston is generally considered to be a very conservative and relatively low crime area.

2. The State convinced this Court that it performed little or perfunctory examination of <u>all</u> jurors, and hence, this Court feels Mr. Stevenson, in this sense was not treated differently from the other jurors.

3. This Court found no evidence of the disparate examination of Mr. Stevenson.

4. It is clear that since one of the reasons given for the challenge of Mr. Stevenson was that he came from west side Manhattan, an area that the State regarded as having substantial problems with gangs, violence, drugs, and high crime, the reason given, is not "unrelated to the facts of the case. [sic]

5. The assertions of "disparate treatment" given by the defense herein are explainable:

   A. The fact that the prosecution did not challenge all males, even though it waived five peremptory challenges has already been explained. The State chose to show that it had great confidence in its case and failed to waive [sic] its final peremptory challenge, not because there was one black left in the jury panel, but because one does not know what qualities a juror selected after the final peremptory challenge is exercised might have.

   B. The fact that the prosecutor did not challenge white veniremen who had lived in the community for the same or less time than Mr. Stevenson is also logically explained by the State. Mr. Barr, although he had lived in Nevada for only 11 months, was from Houston, Texas, had been the victim of a residential burglary, remembered a newsclip concerning the arrest of the defendants and worked as security at the Riviera Hotel part-time. The rest of the people who had lived in Nevada for approximately the same amount or less time than Mr. Stevenson were females who also had positive characteristics from the viewpoint of the State.

   C. The fact that some of the other jurors had either no children or children of similar ages as Mr. Stevenson (17 months and 3 months) was also satisfactorily explained by the State. Mr. Foreman had lived in Clark County for five years, was in the National Guard and had been born and raised in Williams, Arizona; Mr. Barr had positive factors already explained; Mr. Eckerson was one of the last jurors questioned when the State had only one peremptory challenge left. He had prior jury duty, was a computer specialist, worked for the Department of Energy, had 16 years of education and lived in the community for two years; Ms. McGee, among other positive attributes, although having no children, was a woman; the same can be said of Ms. Lillis.

   D. The prosecutor's explanation that he was concerned about the discrepancy between Mr. Stevenson's response of the juror questionnaire that he had lived in Clark County for one year, and on voir dire he indicated that he had lived here for 18 months was not offset by the other jurors mentioned in defenses' brief. Ms. Lillis stated on the questionnaire she had lived in Las Vegas for 23 years and on voir dire, 24 years. This is obviously not significant when the goal was to get jurors with nexus to Clark County; Ms. McGee and Ms. Haws, having made precisely the same discrepancy as that of Mr. Stevenson were women that more properly fit the profile of the State;

-7-

> Ms. Bedunnah had the same 24 year and 23 year discrepancy as Ms. Lillis; and the reason for keeping Mr. Eckerson has already been discussed.
>
> E.   The distinction between Mr. Eckerson, who came from Nyack, New York, and Mr. Barr, who came form Houston, Texas and Mr. Stevenson has already been covered.

Ex. 5, pp. 7-10 (#16-3, pp. 8-11) (emphasis in original). The Nevada Supreme Court affirmed this decision. Ex. 7, pp. 2-3 (#16-3, pp. 18-19). The trial court recognized the rule in Batson and analyzed all of the arguments put forth by the prosecution. Its determination that there was no purposeful discrimination is not objectively unreasonable. 28 U.S.C. § 2254(d)(1).

Petitioner's Batson argument before this Court is considerably narrower than what he presented to the state court; this Court quoted the full holding of the State court to show how thorough it was. Petitioner's argument here is:

> The district attorney stated it wanted a certain type of juror that Mr. Stevenson did not resemble, but it chose a white juror with strikingly similar qualities to him, except for skin color. Mr. Stevenson should have been a more desirable juror than Mr. Eckerson. He had children and could relate to the loss of Mr. Brown, and had been in the military. The discrimination against a potential juror based on race undermines a defendant's right to a fair trial guaranteed by the Sixth Amendment. A new trial should have been granted on that basis.

Amended Petition, p. 12 (#11). The prosecution never had the option to choose between Stevenson and Eckerson. The prosecution peremptorily challenged Stevenson and Eckerson was seated, after a couple of other replacements were excused. Even if, as Petitioner argues, Stevenson should have been more desirable than Eckerson, the choice then facing the prosecution was whether to excuse Eckerson and take a chance with someone whom the prosecution could not remove. Stevenson was no longer part of the calculation.

The Court will turn to Ground 5 because its disposition will affect other grounds. Petitioner gave a statement to the police. He claims that he was not given the warnings required by Miranda v. Arizona, 384 U.S. 46 (1966). The trial court conducted a hearing on this issue. Detective Leavitt testified that he presented a Miranda waiver card and obtained a waiver from Petitioner before taking Petitioner's statement. Petitioner testified that he was informed of his rights and presented with the waiver card after giving his statement. Petitioner also testified that he did not understand those rights. The trial court determined that Petitioner's statement was voluntary,

and that he was advised of his Miranda rights before giving a statement. Ex. 44, pp. 1259-61 (#56-3, pp. 6-8). It was up to the judge to determine the facts, and, based upon the evidence presented, the Court cannot conclude that the factual determination was unreasonable. 28 U.S.C. § 2254(d)(2). Nor was the trial court's ruling contrary to, or an unreasonable application of, Miranda. 28 U.S.C. § 2254(d)(1).

Ground 2 is a claim that trial counsel provided ineffective assistance. Respondents have broken Ground 2 into nine parts, and they argue that Petitioner has not exhausted his available state-court remedies for four of those parts. Respondents also argue that the Court should just deny those unexhausted parts on their merits, pursuant to 28 U.S.C. § 2254(b)(2). Answer, pp. 18-19 (#70). That was all they wrote. If they ask the Court to deny parts of a ground on their merits, then they need to argue why the parts of that ground lack merit. Section 2254(b)(2) does not exist as a different label for the Court to discard unexhausted grounds. It exists for the Court to decide the entire petition on the merits without requiring the parties to return to state court to litigate meritless grounds. The Court does conclude that the unexhausted parts of Ground 2 are without merit.

"[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 & n.14 (1970). A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Strickland expressly declines to articulate specific guidelines for attorney performance beyond generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution. 466 U.S. at 688. The Court avoided defining defense counsel's duties so exhaustively as to give rise to a "checklist for judicial evaluation of attorney

performance. . . . Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Id. at 688-89.

Review of an attorney's performance must be "highly deferential," and must adopt counsel's perspective at the time of the challenged conduct to avoid the "distorting effects of hindsight." Strickland, 466 U.S. at 689. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (citation omitted).

The Sixth Amendment does not guarantee effective counsel per se, but rather a fair proceeding with a reliable outcome. See Strickland, 466 U.S. at 691-92. See also Jennings v. Woodford, 290 F.3d 1006, 1012 (9th Cir. 2002). Consequently, a demonstration that counsel fell below an objective standard of reasonableness alone is insufficient to warrant a finding of ineffective assistance. The petitioner must also show that the attorney's sub-par performance prejudiced the defense. Strickland, 466 U.S. at 691-92. There must be a reasonable probability that, but for the attorney's challenged conduct, the result of the proceeding in question would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

If a state court applies the principles of Strickland to a claim of ineffective assistance of counsel in a proceeding before that court, the petitioner must show that the state court applied Strickland in an objectively unreasonable manner to gain federal habeas corpus relief. Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

The issues that Petitioner presented to the state court concern counsel's pre-trial activities. Petitioner claimed that counsel did not investigate, interview witnesses, and meet reasonably with Petitioner. A claim that Petitioner now presents is that counsel failed to formulate a defense on behalf of Petitioner, but that is largely a re-phrasing of the claims that Petitioner presented to the state court. On these issues, the Nevada Supreme Court held:

> Second, Lee contends that he was deprived of effective assistance of counsel because Phillips [one of Lee's attorneys] failed to communicate adequately with him and his family and, therefore, Lee contends, failed to learn of a crucial alibi witness, Lee's brother. Phillips stated that he personally investigated a number of alibi witnesses, but that an alibi defense did not fit with what Lee had said and with what was in the police reports. We conclude that, in light of the ample evidence tying Lee to the crimes—including finger prints, the testimony of his co-conspirators, and his own statements to the police—there is not a reasonable probability that the result of the trial would have been different, even if Phillips had presented the alibi testimony now suggested by Lee. Accordingly, we conclude that this contention is without merit.
>
> Third, Lee contends that he was deprived of effective assistance of counsel because Phillips failed to conduct an adequate pre-trial investigation. This contention is essentially the same as the alibi argument above. We conclude that, although Phillips' investigation may have been deficient in some respects, Lee has not demonstrated that he has been prejudiced thereby.

Ex. 23, pp. 3-4 (#17-2, pp. 13-14). Petitioner had given the police a statement. Detective Leavitt told Petitioner that John Henry Brown was killed in the early morning of August 10, 1985, at or around 1908 Allen Lane. Petitioner admitted that he drove a brown and light brown car the night of August 9 and the morning of August 10. Petitioner denied knowing that the car was stolen. Petitioner said that he obtained the car from a "Kenny Daniels," and that the keys were in the car. Petitioner went to an apartment complex known as the Brownies, for a party, to find that the party was over when he arrived. Petitioner saw a white person walking, delivering newspaper. That person was shot with a .22-caliber sawed-off rifle. Petitioner also noted that police chased the car, which crashed, and that he then jumped out of the car and ran. Petitioner said that the white man was hit one time before being shot. Ex. 44, p. 1264-69 (#56-3, pp. 11-16). Petitioner's statement, by itself, removed any possibility of an alibi defense. The testimony of Michael Jones, described below, showed that Petitioner could have no alibi for earlier in the evening. The testimony of the co-defendants showed that Petitioner could have no alibi for later in the evening. Part of Petitioner's palm print was found on the car of the murder victim. Petitioner's shoe print was found on the face of the murder victim. Even if counsel did all that Petitioner argues that counsel should have done, counsel still would not have been able to develop a credible alibi defense. The Nevada Supreme Court reasonably applied Strickland. 28 U.S.C. § 2254(d)(1).

Next, Petitioner claims that counsel failed to move timely to sever his trial from that of his co-defendants. Ground 3 is the underlying claim that the trial court abused its discretion in

denying the motions for severance from Petitioner and his co-defendants. The Court considers the two claims together. On the ineffective-assistance claim, the Nevada Supreme Court held:

> NRS 173.135 specifically allows for defendants to be tried together where, as in this case, each is alleged to have participated in the same series of criminal acts. Having reviewed the record in this case, and <u>noting that the several motions for severance presented by Lee's co-defendants were denied by the district court</u>, we conclude that Lee has not shown a reasonable probability that, but for his counsel's failure to file a motion to sever, the result of his trial would have been different. Accordingly, we conclude that this contention is without merit.

Ex. 23, pp. 2-3 (#17-2, pp. 12-13) (emphasis added). The emphasized portion of the decision is misleading. In his direct appeal, Petitioner and co-defendant Hayes argued that the district court should have severed the trial. The Nevada Supreme Court noted that the motions for severance were denied because they were untimely, and the Nevada Supreme Court upheld that exercise of the trial court's discretion. Ex. 7, pp. 8-9 (#16-3, pp. 24-25). In the habeas corpus appeal, the Nevada Supreme Court effectively held that Petitioner suffered no prejudice from an untimely motion for severance because a co-defendant also filed an untimely motion for severance.

Petitioner's co-defendants, Hayes and Hampton, gave statements to the police that implicated Petitioner in the crimes. However, Hayes and Hampton also testified at trial, and Petitioner's counsel cross-examined them. Because of the availability for cross-examination, Petitioner correctly notes that the joint trial did not violate Petitioner's right to confront the witnesses against him. See <u>Bruton v. United States</u>, 391 U.S. 123 (1968); <u>Santoro v. United States</u>, 402 F.2d 920, 922-23 (9th Cir. 1968).

Petitioner cites to inapplicable authority in support of his argument that the trial should have been severed. <u>Zafiro v. United States</u>, 506 U.S. 534 (1993), and <u>United States v. Throckmorton</u>, 87 F.3d 1069 (9th Cir. 1996), apply Rules 8 and 14 of the Federal Rules of Criminal Procedure, not the Constitution. Furthermore, <u>Throckmorton</u> is not a holding of the Supreme Court of the United States and is inapplicable pursuant to 28 U.S.C. § 2254(d)(1), too. On the constitutional issue, the Supreme Court of the United States has stated:

> Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.

United States v. Lane, 474 U.S. 438, 446 n.8 (1984). However, just as in Zafiro and Throckmorton, the joinder issue in Lane concerned the Federal Rules of Criminal Procedure, not the Constitution. Footnote 8 is a dictum, and the Supreme Court has never actually applied the principle in footnote 8 to a constitutional claim that a trial should have been severed. Therefore, the Nevada Supreme Court's decision on severance could not have been contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).

Furthermore, the ineffective-assistance claim in Ground Two is without merit. Petitioner argues that the joint trial violated his rights because, even with cross-examination, Hayes and Hampton blamed Petitioner for kidnaping Brown and for actually killing Brown. Amended Petition, pp. 24-26 (#11). Testimony from others at the trial showed that Brown was taken from his car at one apartment complex, where he was preparing newspapers for delivery, that Brown was killed at another apartment complex some distance away, that Petitioner's palm print was found on Brown's car, and that Petitioner's shoe print was found on Brown's face. Petitioner's own statement to the police showed that he was involved with the kidnaping and death of Brown. The jury was instructed that killing Brown in the course of kidnaping is first degree murder for all defendants, regardless of who actually killed Brown, and regardless of others forbidding the actual killer to use deadly force. Ex. 37, Instruction 8 (#51-4, p. 12). It did not matter who killed Brown, because all were guilty of first degree murder, and the testimony by Hayes and Hampton that Petitioner was the killer caused Petitioner no prejudice.[3] This portion of Ground 2 is without merit.

Petitioner argues that trial counsel was ineffective for failing to object to the introduction of evidence of prior bad acts. Petitioner did raise the issue on direct appeal. The Nevada Supreme Court ruled:

> Appellants Hampton and Lee contend that the district court erred in admitting certain evidence of uncharged crimes, i.e., the testimony of certain witnesses which linked appellants to other shootings on the same night and testimony by the owner of the

---

[3] Indeed, blaming Petitioner did them no good, because all three defendants were found guilty of first degree murder with the use of a deadly weapon, and all were sentenced to life imprisonment without the possibility of parole. See Ex. 7, p. 1 (#16-3, p. 17).

-13-

> stolen car appellants used to commit the crimes. . . . The district court properly admitted this evidence so that the prosecutor could present a full and accurate account of the circumstances surrounding the crimes. . . . The evidence was not unduly prejudicial, and the district court did not abuse its discretion in admitting it.

Ex. 7, p. 7 (#16-3, p. 23) (citations omitted). Even though trial counsel did not object to this evidence, Petitioner was able to litigate the matter on appeal. Therefore, Petitioner suffered no prejudice from the lack of objection at trial. This portion of Ground 2 is without merit.

Petitioner claims that trial counsel failed to object to Petitioner's sentence of life imprisonment without the possibility of parole, on the basis of a statute governing the maximum sentence for juvenile offenders. At the time, Nev. Rev. Stat. § 176.025 stated:

> A death sentence shall not be imposed or inflicted upon any person convicted of a crime now punishable by death who at the time of the commission of such crime was under the age of 16 years. As to such person, the maximum punishment that may be imposed shall be life imprisonment.

The crimes occurred a few days before Petitioner's 16th birthday. Petitioner argues that because the statute did not specify whether the life sentence would contain the possibility of parole, it should be construed strictly in his favor and he should have been sentenced to life imprisonment with the possibility of parole. In 2005, § 176.025 was amended to state:

> A sentence of death must not be imposed or inflicted upon any person convicted of a crime now punishable by death who at the time of the commission of the crime was under the age of 18 years. As to such person, the maximum punishment that may be imposed is life imprisonment.

The amendment probably was in response to Roper v. Simmons, 543 U.S. 551 (2005). The amendment, as codified, does not affect Petitioner's sentence. However, an portion of the statute that was not codified states:

> 2.   A sentence of death to which this act applies retroactively shall be deemed to be commuted to a sentence of life without the possibility of parole on the effective date of this act. The Director of the Department of Corrections shall take all actions necessary to carry out the provisions of this section.

2005 Nev. Stat., c. 33, § 2 (emphasis added). That provision resolves the issue. A sentence of life imprisonment without the possibility of parole is within the scope of § 176.025. Petitioner did not suffer any prejudice from appellate counsel not raising the issue.

-14-

Petitioner's last issue of ineffective assistance of counsel is that counsel did not object to the guilty verdict for the attempted murder with the use of a deadly weapon of Christopher Shelton, after the prosecution conceded at the closing argument that they had proven battery but not attempted murder. Ground 11 is the underlying claim that the jury improperly returned a guilty verdict for attempted murder. The Court considers both claims at the same time.

In considering this claim along with other claims that insufficient evidence was presented to support the verdicts, the Nevada Supreme Court held, "Specifically, several witnesses saw the car from which people were shot at different locations and each identified one or more of the appellants as occupants of that car." Ex. 7, p. 6 (#16-3, p. 22). Shelton testified that he was a pedestrian at or near the intersection of D St. and Jackson Ave. when a two-tone Toyota approached. Shelton saw someone pointing a gun out of the Toyota, shooting at him or in his direction. Ex. 39, p. 252 (#52-5, p. 8). He was hit in the lower left ankle, and the bullet went all the way through. Id., pp. 254-55 (#52-5, pp. 10-11). Darrell Finks testified that at the same time he was a passenger in a pickup truck at or near the intersection of D St. and Jackson Ave., when a two-tone Toyota approached from the opposite direction, and the occupants shot at the truck. Ex. 39, p. 207 (#52-3, p. 3). He was hit in the buttocks. Id., pp. 210-11 (#52-3, pp. 6-7). Michael Jones, who was one of Hayes' witnesses, testified that he was in the two-tone Toyota with Petitioner at the intersection of D St. and Jackson Ave. at the same time, when they approached a pickup truck from the opposite direction and fired their weapons. Earlier, the people in the truck might have acted in some way that Petitioner felt was inappropriate; Jones appeared to be at odds with his own police statement on that matter. Ex. 46, pp. 1607-31 (#57-10, p. 14, through #57-11, p. 14).[4] Petitioner points out some discrepancies in Shelton's identifications, but all of this evidence combined was more than enough to justify a verdict of guilty for the attempted murder of Shelton.

---

[4] Jones testified that he was carrying a sawed-off, .22-caliber rifle during the shooting at D St. and Jackson Ave. Later, Jones and Petitioner went to a party, where Jones was shot. Jones fled, and he dropped the sawed-off rifle. Ex. 46, pp. 1624-38 (#57-11, pp. 6-20). That sawed-off rifle was used to kill Brown.

1  The Batson hearing brought out the explanation why the prosecutor Michael Villani
2  stated that they did not prove the attempted murder of Shelton.  Prosecutor Melvyn Harmon noted
3  that when Villani made that statement, they did not have the transcript, and that they did not
4  remember what the witnesses had said.  After reviewing the record, they noted that Shelton had
5  testified that he saw a gun pointed at him from a window of the Toyota.  Ex. 57, pp. 47-48 (#60-4,
6  pp. 24-25).  Villani's statement was not evidence and, based upon the evidence outlined above, the
7  jury did not agree with him.  Ground 11 is without merit, as is the part of Ground 2 concerning
8  counsel's lack of objection to the verdict.

9  Ground 4 is a claim that the district court erred in admitting evidence of Petitioner's
10 prior uncharged crimes.  This is a matter of state evidentiary law, which does not implicate any
11 constitutional right unless it renders the trial fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62,
12 67-68, 75 (1991).  As noted above, Petitioner raised this issue on direct appeal, and the Nevada
13 Supreme Court held:

> Appellants Hampton and Lee contend that the district court erred in admitting certain evidence of uncharged crimes, i.e., the testimony of certain witnesses which linked appellants to other shootings on the same night and testimony by the owner of the stolen car appellants used to commit the crimes. . . .  The district court properly admitted this evidence so that the prosecutor could present a full and accurate account of the circumstances surrounding the crimes. . . .  The evidence was not unduly prejudicial, and the district court did not abuse its discretion in admitting it.

18 Ex. 7, p. 7 (#16-3, p. 23).  After the short chase, Police found that a butter knife had been used to
19 operate the Toyota's ignition switch.  That testimony was unobjectionable, and the jury could infer
20 easily that the car was stolen.  Testimony from the Toyota's owner that the car had been stolen did
21 not make the trial unfair.  The Nevada Supreme Court reasonably applied McGuire.  28 U.S.C.
22 § 2254(d)(1).

23 Petitioner argues that Michael Jones' testimony introduced evidence of an uncharged
24 shooting that occurred on the same night.  Amended Petition, pp. 29-31 (#11).  The argument is
25 inaccurate.  As shown above, Jones described the shooting at D. St. and Jackson Ave. that led to the
26 wounding of Shelton and Finks, and Petitioner was charged with those crimes.  That part of Ground
27 4 is without merit.
28

In Ground 6, Petitioner argues that the prosecution failed to prove that Brown died as a result of a homicide, because the medical examiner could not rule out accident as a cause of the death. The Nevada Supreme Court held:

> Appellant Lee contends that the state has not adequately established the corpus delicti of the crime, i.e., that a murder had been committed, because the Clark County medical examiner could not rule out an accident as the cause of death of the victim, John Brown. The medical examiner testified at trial, however, that he was certain a homicide was the cause of death. The physical evidence in this case, taken as a whole, supports the conclusion that John Brown was murdered. Specifically, Brown died from a gunshot wound to the head that was not self-inflicted, recovered bullet fragments were consistent with the type of gun used by appellants, and a herringbone pattern imprinted upon Brown's face was consistent with the tread of Lee's shoes. Consequently, this contention lacks merit.

Ex. 7, pp. 6-7 (#16-3, pp. 22-23). "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979) (citing In re Winship, 397 U.S. 358 (1970)). On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16. The Nevada Supreme Court reasonably applied Jackson. 28 U.S.C. § 2254(d)(1).

Furthermore, the ground lacks merit. A killing that occurs during the course of kidnaping or robbery is first-degree murder, regardless of whether the killing was intentional, unintentional, or accidental. Ex. 37, Instruction 7 (#51-4, p. 7). Even if Brown was killed accidentally, Petitioner is guilty of first-degree murder.

In Ground 7, Petitioner claims that his right to a presumption of innocence was violated because five jurors saw him shackled on the second day of the trial, November 19, 1985. Petitioner raised this claim on direct appeal, and the Nevada Supreme Court held:

> Appellants Hayes and Lee contend that the district court violated their constitutional rights to a presumption of innocence by denying their motions for a mistrial after some of the jurors inadvertently saw then in handcuffs, shackles and waist chains. Ths district court instructed the jurors to disregard this incident. Further, the district court polled the jurors and determined that Hayes and Lee were not prejudiced by

-17-

> this incident. Therefore, the district court properly denied the motion for a mistrial. See Grooms v. State, 96 Nev. 142, 605 P.2d 1145 (1980).

Ex. 7, p. 9 (#16-3, p. 25). "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Deck v. Missouri, 544 U.S. 622, 629 (2005). That is the current state of the law. The state of the law in 1985-90 was much less settled. "The Supreme Court has not been presented with the question whether a brief and inadvertent observation by jurors of a defendant in handcuffs outside the courtroom compels an automatic reversal." U.S. v. Halliburton, 870 F.2d 557, 569 (9th Cir. 1989). It matters not whether that is still the situation today. It was the when the trial occurred in 1985 and when the Nevada Supreme Court dismissed the direct appeal in 1990. Therefore, the Nevada Supreme Court's decision could not have been contrary to, or an unreasonable application of, clearly-established federal law as determined by the Supreme Court of the United States. Ground 7 is without merit. See 28 U.S.C. § 2254(d)(1).

Apart from the operation of § 2254(d)(1), the viewing of Petitioner in shackles by five juror was harmless error. Petitioner's theory of defense was "that there [was] a conscious effort on the part of the police department, meaning Officer Brotherson and Officers Leavitt and Hatch to convict Donald Ray Lee, evidence that may have been fabricated." Ex. 49, p. 2048 (#59-4, p. 2). To that end, Petitioner called as a witness Patricia Schmitt, who worked in the Metro Detention Center records section. She testified that Petitioner was booked into custody on August 10, 1985, and that on November 18, 1985, clothing was exchanged for Petitioner's court appearances. Ex. 49, pp. 2049-51 (#59-4, pp. 3-5). The trial started on that date. See Ex. 38 (#51-6 et seq.). In other words, Petitioner himself introduced evidence that he was in jail. The viewing by five jurors of Petitioner in shackles could not have had a substantial and injurious effect or influence in determining the jury's verdict, because by the end of the trial Petitioner himself told the entire jury that he was in custody. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In Ground 8, Petitioner claims that the prosecution committed misconduct in the closing argument. On direct appeal, the Nevada Supreme Court held:

> Appellants Hayes and Lee contend that the prosecutor at their trial committed misconduct requiring reversal of their convictions by injecting his opinion of their guilt, by commenting on the possibility that appellants would kill again and by making arguments concerning community standards. . . . While some of the prosecutor's remarks were perhaps ill-advised, they were not so egregious as the prosecutor's conduct in Collier.

Ex. 7, p. 9 (#16-3, p. 25) (citing Collier v. State, 705 P.2d 1126 (1985)). "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation omitted). See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Petitioner takes issue with the Nevada Supreme Court's holding that the prosecutor's comments in this case were not as bad as the prosecutor's comments in Collier, which, among other reasons, resulted in a remand for a new death penalty hearing. However, in Collier the Nevada Supreme Court analyzed whether the prosecutor's comments made the penalty hearing unfair. Although the court did not cite to Darden or other opinions by the Supreme Court of the United States, it used the correct principle. There is nothing unreasonable about the Nevada Supreme Court then using the comments Collier as a basis of comparison for subsequent cases, such as Petitioner's. 28 U.S.C. § 2254(d)(1).

In Ground 9, Petitioner argues that the instruction defining reasonable doubt violates the Due Process Clause. See Ex. 37, Instruction 40 (#51-5, p. 12). Despite Petitioner's arguments to the contrary, this instruction is exactly the same as the instruction that the Court of Appeals for the Ninth Circuit determined was constitutional. Ramirez v. Hatcher, 136 F.3d 1209, 1211-15 (9th Cir. 1998). That court has also held that the issue is not worthy of a certificate of appealability. Nevius v. McDaniel, 218 F.3d 940, 944-45 (9th Cir. 2000). Ground 9 is without merit.

As noted above, Grounds 10 and 12 have been dismissed.

IT IS THEREFORE ORDERED that the Amended Petition for Writ of Habeas Corpus (#11) is **DENIED**.

The Clerk shall enter judgment accordingly.

Dated this 9th day of March, 2009.

_____
EDWARD C. REED
United States District Judge